# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

WILLIAM WHITFIELD JACKSON,

     Plaintiff,

     v.                             Case No. 03-C-1395

RYAN INTERNATIONAL AIRLINES,

     Defendant.

## DECISION AND ORDER

The plaintiff, William Whitfield Jackson, who is proceeding pro se, filed a complaint on December 3, 2003, which he amended on May 26, 2004, asserting a claim of discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. , and a claim of retaliatory discharge. He also asserts that he was subjected to discrimination, a hostile work environment, and retaliatory discharge based on his sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended. The plaintiff was granted leave to proceed in forma pauperis.   On July 8, 2004, the defendants filed their answer to the amended complaint.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes.  Venue is proper under 28 U.S.C. § 1391.  The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72.1 (E.D. Wis.).  The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

1

On December 17, 2004, pursuant to Rule 56 of the Federal Rules of Civil Procedure the defendants filed a motion for summary judgment, proposed findings of fact, proposed conclusions of law, a brief and six affidavits in support of their motion.  On January 19, 2005, the plaintiff submitted a motion for order to deny defendant's motion for summary judgment, proposed findings of fact, proposed conclusions of law, an affidavit and a brief in opposition to the defendants' motion for summary judgment.  The defendants submitted a reply brief in support of their motion for summary judgment on February 3, 2005, a reply to the plaintiff's response to the defendant's proposed findings of fact, a response to the plaintiff's proposed findings of fact, and a brief in opposition to the plaintiff's motion for order to deny defendants' motion for summary judgment.  On February 7, 2005, the plaintiff filed a request for judicial notice (Docket #104) and an affidavit (Docket #105).  On February, 14, 2005, the defendant filed a motion to strike the plaintiff's judicial notice, affidavit, disability report and exhibits.

The following motions are ready for resolution and will be addressed herein: the defendants' motion for summary judgment (Docket # 82); the plaintiff's motion for order to deny defendant's motion for summary judgment (Docket #93); and the defendants' motion to strike the plaintiff's judicial notice, affidavit, disability report and exhibits. (Docket # 107).

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F.Supp. 1458, 1460-61 (E.D. Wis. 1991).  "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit."  See Anderson, 477 U.S. at 248.  A

2

dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact; and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., Ltd., 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. Anderson, 477 U.S. at 267; see also, Celotex Corp., 477 U.S. at 324; Fed. R. Civ. P. 56(e). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322 (emphasis added).

The defendant submitted three filings in support of it's proposed findings of fact: 1) the defendant's proposed findings of fact, 2) a reply to the plaintiff's response to the defendant's proposed findings of fact, and 3) a response to the plaintiff's proposed findings of fact. The plaintiff submitted one filing of proposed findings of fact in opposition to the defendant's motion for summary judgment. The court notes that, the plaintiff did not submit a specific response to the defendant's proposed findings of fact and did not refer to contested findings by paragraph number as required by Civil L.R. 56.2(b)(1). In addition, the defendant objects to the plaintiff's proposed findings of fact. The defendant contends that pursuant to Civil L.R. 56.2(b)(2) the plaintiff may only include additional allegedly undisputed material facts and additional material facts which are disputed and preclude summary judgment. The defendant

3

also asserts that the plaintiff fails to provide proper citations to evidentiary materials in the record in support of his proposed findings of fact.

To the extent a party has not provided evidentiary support for its opposition to a particular proposed finding of fact, such party has not raised an arguable factual dispute. In addition, the court must conclude that there is no genuine issue of material fact as to any proposed finding of fact to which no response has been set forth. Furthermore, an affidavit laden with conclusory legal statements and barren of any relevant facts of which the affiant had personal knowledge is not proper under Rule 56(e). See Resolution Trust Corporation v. Juergens, 965 F.2d 149, 152-53 (7th Cir. 1992). "It is well settled that conclusory allegations . . . without support in the record, do not create a triable issue of fact." Hall v. Bodine Elec. Co., 276 F.3d 345, 354 (7th Cir. 2002) (citing Patterson v. Chicago Ass'n for Retarded Citizens, 150 F.3d 719, 724 [7th Cir. 1998]). To the extent that the information in the submissions of either party fails to meet the requirements of the rules, it will not be considered.

## MOTION TO STRIKE

The defendant moves to strike the plaintiff's February 7, 2005, filings as untimely, and for failure to comply with the requirements of Fed. R. Civ. P. 56, Civil L.R. 56.2, and Fed. R. Evid. 201. The filings which were filed after the defendant's reply brief are a judicial notice, affidavit, disability report and exhibits.

The defendant asserts that Civil L.R. 56.2(b) provides that materials in opposition to a summary judgment motion must be filed within thirty days from service of the original motion and that the rules do not permit the party opposing the motion a second opportunity to respond. In addition, the defendant argues that the plaintiff's affidavit filed on February 7, 2005, is not a sworn statement because it is not notarized, making it, and the documents

4

attached to it, impermissible under the rules. The defendant further contends that the plaintiff's request that the court take judicial notice of the plaintiff's affidavit does not address matters appropriate for judicial notice under the Federal Rules of Evidence. Federal Rule of Evidence 201(b) provides:

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

A review of the plaintiff's affidavit reveals that it is not the kind of information suitable for judicial notice. Its content reflects the plaintiff's beliefs and alleges certain facts. These matters do not reflect facts generally known within the territorial jurisdiction of the court, nor information capable of determination by resort to sources whose accuracy cannot reasonably be questioned. See Fed. R. Evid. Rule 201(b). Therefore, the court will not take judicial notice of the information as requested by the plaintiff.

Regarding the defendant's contention that the affidavit fails to comport with the rules, the court notes that the affidavit filed by the plaintiff on February 7, 2005, states that it is given "under penalty of perjury under the laws of the United States of America" and that the contents "are true and correct." (Docket #105). Section 1746 of Title 28, United States Code, provides that declarations made under penalty of perjury that verify the truth of the assertions they contain satisfy Rule 56(e). Dale v. Lappin, 376 F.3d 652, 655 (7th Cir. 2004); Ford v. Wilson, 90 F.3d 245, 247 (7th Cir. 1996). Accordingly, the plaintiff's verified affidavit constitutes competent evidence to challenge the defendant's motion for summary judgment.

All litigants in this district are expected to comply with the district court's local rules, including those governing summary judgment procedures. Local rules which reflect an attempt to make the parties' respective summary judgment obligations explicit no doubt benefit the parties themselves by requiring the parties to clarify exactly what they dispute and

5

on what evidence they rely.  <u>Waldridge v. Am. Hoechst Corp</u>., 24 F.3d 918, 923 (7th Cir. 1994).  But they are of "significantly greater benefit to the court which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information."  <u>Id</u>. at 923-24.  Whether to apply Civil L.R. 56.2  strictly or to overlook any transgression is a matter within the district court's discretion.  <u>Id</u>. at 923.

Although the plaintiff's submissions filed after the defendant's reply brief are not contemplated by the local rules, a review of the plaintiff's February 7, 2005, affidavit shows that the plaintiff was responding to the defendant's assertion in its February 3, 2005, reply brief of procedural noncompliance by the plaintiff.  In their reply brief, the defendant maintains that the plaintiff's submissions in opposition to the defendant's motion for summary judgment failed to comply with Fed. R. Civ. P. 56 and Civil L.R. 56.2 and should be stricken.  Under the circumstances, to the extent that the plaintiff's submissions are relevant and admissible, the court will consider them.

Based on the foregoing, the defendant's motion to strike the plaintiff's request for judicial notice will be granted.  The defendant's motion to strike will be denied in all other respects.

### Relevant Undisputed Facts[1]

The plaintiff, William W. Jackson, is an adult resident of the State of Wisconsin.  The defendant, Ryan International Airlines, Inc. (RIA) is a Kansas corporation with its principal place of business located in Wichita, Kansas.  RIA provides scheduled and nonscheduled passenger and cargo charter airline services.  RIA works with various tour companies and

---

[1]As a general matter, unless accompanied by citation, the relevant facts are taken from the stipulated facts and from the parties' proposed findings of fact which are not disputed.  Citations to sources of quoted excerpts have been included even when those excerpts are undisputed.

provides seasonal flights to vacation destinations such as the Dominican Republic, Jamaica and Mexico.

At the time the plaintiff worked for RIA, RIA's director of human resources was Kevin Chiles. The current director of human resources is Kim Roark.

David Lehrer was the 2001-2002 season base coordinator and supervisor of the plaintiff. During the 2002-2003 season, the plaintiff's supervisor at RIA was his base coordinator, Kerrie Bree. Ms. Bree's primary duty as the base coordinator is to supervise all flight attendants at her base. The base coordinator is located on-site at the base and is responsible for ensuring all RIA policy and procedures are enforced. Ms. Bree reported to the manager of inflight, Susan Rowl. The base coordinator works with the manager of inflight to discipline employees who do not comply with RIA policy and carries out discipline as dictated by the manager of inflight. Director of Inflight Sunny Charpentier supervised Ms. Rowl and Ms. Bree, who were all supervisors of the plaintiff.

Susan Rowl was the manager of inflight for RIA during the 2002-2003 season. As manager of inflight, Ms. Rowl worked out of RIA's Wichita, Kansas, corporate office and was in charge of managing all base coordinators, as well as interpreting and enforcing all of RIA's policies pertaining to flight attendants. As part of this job, Ms. Rowl was in charge of issuing discipline to flight attendants and discharging flight attendants for violations of RIA's policies, after consultation with the director of human resources. The discipline issued by Ms. Rowl was determined based upon information provided to Ms. Rowl by the base coordinators.

Robert Winter was the Milwaukee station manager for RIA during the 2002-2003 season. The station manager is responsible for oversight of all phases of ground operations at a particular base, including customer service functions such as ticketing, baggage handling, cargo operations and passenger security. Mr. Winter does not supervise flight attendants.

7

Nancy Hoke was assistant station manager for the Milwaukee, Wisconsin base during the 2002-2003 season.

RIA has a crew scheduling department which operates out of its Wichita, Kansas, facility. The job of the crew scheduling department is to ensure that all RIA flights are adequately staffed, pursuant to Federal Aviation Administration (FAA) regulations, and are able to take off on time. As part of its job, the crew scheduling department produces and distributes flight schedules to all crew members. Flight attendants who cannot make a scheduled flight are required to notify crew scheduling and then crew scheduling must find a replacement so that the flight has enough attendants. The crew scheduling department only handles scheduling issues; it is not responsible for communication with base coordinators about flight attendant attendance or other personnel issues.

RIA flight attendants are employed at-will and can be terminated at any time, with or without notice and with or without cause. RIA has numerous policies and procedures that flight attendants are required to follow. RIA's policies and procedures are reviewed with all flight attendants during a month-long flight attendant training course. At the end of this course, flight attendants are tested on the policies. Flight attendants are not permitted to begin working until they pass all necessary tests.

It is essential to RIA that flight attendants call both the crew scheduling department and their base coordinator if they are going to be absent. The crew scheduling department must be notified of absences immediately because it is responsible for ensuring adequate staffing of flights. The base coordinator must be notified because he or she is the flight attendant's supervisor and if that absence is not communicated, the base coordinator may not know the employee is absent and will not be able to manage personnel issues. If both are not notified, they could be working against each other or unnecessarily duplicating efforts.

8

During the 2002-2003 season, RIA had five policies stating that if a flight attendant is going to be absent from work, he or she must call not only crew scheduling, but also his or her base coordinator. These policies are Inflight Policies and Procedure ("IPP") 3, 4, 7, 8, and the RIA Flight Attendant Policy on Illness.

Internal Policies and Procedures #7, "Failure to Personally Notify Base Coordinator and Scheduling PRIOR TO an Absence or Late Show," states that seasonal flight attendants must call both their base coordinator and crew scheduling when they are absent or tardy. (Affidavit of Joy M. Burkholder [Burkholder Affidavit], Exhibit B, Deposition of William Jackson [Plaintiff's Deposition], Exhibit 8). Those who violate this policy twice are terminated. Internal Policies and Procedures #7 provides in relevant :

> NOTIFICATION/LIMITATIONS RELATIVE TO FAILING TO PERSONALLY NOTIFY BASE COORDINATOR <u>AND</u> SCHEDULING PRIOR TO AN ABSENCE OR LATE SHOW:
>
> Seasonal flight attendants: The 2nd occurrence within their consecutive seasonal career with Ryan International Airlines will result in termination.
>
> 1st occurrence:      1st and final written notification - next occurrence results in termination.
>
> 2nd occurrence:      termination.

(Burkholder Affidavit, Exhibit B, Plaintiff's Deposition, Exhibit 8).

Internal Policies and Procedures #3 provides in pertinent part:

> Missing a duty assignment, meeting or training session for <u>any</u> reason will be considered an absence - no distinction as to the reason for the absence will be made.
>
> The total number of days that a flight attendant is absent for the same reason will be counted as one absence (e.g., if a flight attendant misses three duty days because of the same illness, all three duty days missed will be counted as one absence).

\*   \*   \*

9

If a flight attendant will be absent from duty, a meeting or training session due to a <u>nonwork-related</u> illness or injury, he/she must **personally** notify their base coordinator <u>and</u> Scheduling prior to their absence (see the section titled "Failure to Notify Base Coordinator and Scheduling Prior to an Absence"). Exception to this will be made if a doctor's note is provided to the base coordinator which indicates the ill or injured flight attendant was incapacitated at the time such notification should have occurred.

(Burkholder Affidavit, Exhibit B, Plaintiff's Deposition, Exhibit 10).

Internal Policies and Procedures #4, "Leave of Absence," states that for an approved leave of absence, a flight attendant must submit a leave of absence request (LOAR) form. (Burkholder Affidavit, Exhibit B, Plaintiff's Deposition, Exhibit 11). This form was provided to all seasonal flight attendants at the Milwaukee base by Ms. Bree at the beginning of the 2002-2003 season.

RIA Flight Attendant Manual Policies and Procedures relating to attendance states:

3. **Disciplinary Process - Due to Illness**

   a. The first step of documentation to such an employee will be in the format of a **"Written Caution,"** and a doctor's release will be required for all subsequent absences. This written caution will be given to the employee after the **second** absence.

   b. For the **third** absence a second **"Written Caution"** will be issued along with scheduling a mandatory meeting with a Supervisor.

   c. After the fourth absence, the disciplinary process will be utilized. The Supervisor will hold a **"Written Review"** with the employee.

   d. After the **fifth** absence, the employee will be given a **"Written Final Warning."** Once the employee receives a **final warning**, the final warning will remain on record until it is corrected. This step will not be repeated in the future.

   e. The **sixth** absence in a rolling 12-month period may result in immediate termination without further notice.

(Plaintiff's Brief in Opposition to Defendant's Motion for Summary on Title I and Title VII Defendants Claims Are Not Before This Court (sic) [Plaintiff's Brief in Opposition], Bates

10

#1198, Ryan International Airlines, Inc., Flight Attendant Manual, Policies and Procedures, Chapter 1, at 31).

The plaintiff worked as a seasonal flight attendant out of RIA's Milwaukee, Wisconsin, base during three seasons beginning in about January 2001. As a seasonal flight attendant, he was hired to work from November or December through April. The plaintiff was trained on, and responsible to know, all of RIA's policies and acknowledged that they were reasonable. The plaintiff was trained on RIA's policy on reporting harassment. The plaintiff enjoyed being a flight attendant for RIA during the 2001 season and applied to be a flight attendant instructor with RIA in the summer of 2001. The plaintiff received training for a flight attendant instructor position, but due to the events of September 11, 2001, there were not many flight attendant students and the plaintiff was not needed as an instructor.

The plaintiff worked as a regular seasonal flight attendant out of the RIA Milwaukee base for the 2001-2002 season, from about December of 2001 through about the beginning of May 2002, when he was furloughed for the summer. The plaintiff spent time in Kuwait in the summer of 2002 and, upon his return, contacted RIA regarding being employed as a seasonal flight attendant with RIA during the 2002-2003 season. RIA hired the plaintiff for a third season and sent him for re-training in October of 2002. His first flight that season was in December of 2002.

On October 13, 2002, the plaintiff sent an e-mail to Sunny Charpentier, copying C. Rodriguez, stating:

Dear Sunny:

If Ryan needs a Base Coordinator or other assistance, I am willing to assist in anyway possible. I have completed my retraining at ORD on 10-12-02. Please feel free to rely on me whenever I may be of assistance to you.

(Plaintiff's Brief in Opposition, Bates #2721).

11

This e-mail was forwarded by Cesario Rodriguez to Susan Turner. On October 17, 2002, she responded in an e-mail to Sunny Charpentier and Mr. Rodriguez describing her perception of the plaintiff and his relationship with David Lehrer. She concluded with:

> I wouldn't have Mr. Chiropractor Who Can't Do Bomb Searches as the MKE base coordinator anymore than I would have his buddy David Lehrer. What a manipulator - - he and David make a great pair. Brother, they think we're stupid & if he bypasses me, I won't get the info & know exactly what they're up to. Boys, boys, you just don't get it, do ya . . . .

(Plaintiff's Brief in Opposition, Bates #2718).

During the 2002-2003 season, the lead flight attendant was a male, Adam Pflueger. Lead flight attendants have authority over all flight attendants on a given flight and are the first point of contact for flight attendants on their flights. The lead flight attendant reports to the base coordinator, who is the primary supervisor of all flight attendants at a base.

Kerrie Bree was the plaintiff's base coordinator and supervisor during the 2002-2003 season. In March of 2003, Ms. Bree had to be away from the Milwaukee base for a period of time. On March 6, 2003, she sent a memorandum to all Milwaukee flight attendants informing them that during the time she was away from Milwaukee, all

> policies and procedures which we are all familiar *remain the same* . . .. If you are going to be absent or tardy, you must still contact me as required by the policies and procedures, and please also notify Nancy [Hoke] . . . Bob [Winter] can be reached . . . but Nancy should be contacted first.

(Burkholder Affidavit, Exhibit B; Plaintiff's Deposition, Exhibit 13). This memorandum included Ms. Bree's cell phone number and her e-mail address. The plaintiff received the March 6, 2003, memorandum.

Between February 19, 2003, and April 9, 2003, the plaintiff received five letters from RIA supervisors acknowledging his outstanding performance as an employee. On February 19, 2003, RIA's Vice President of Flight Operations, David Ray, wrote a letter to the plaintiff, stating in part: "Ryan International Airlines is considered one of the best in the business of

12

charter aviation today by our customers, competitors and vendors alike, but it is particularly gratifying to have a passenger confirm what we have always known–it is our people that put us at the top. Thank you for your service and continued efforts on behalf of Ryan International Airlines." (Complaint, Exhibit 03/36). On February 28, 2003, Mr. Ray wrote to the plaintiff, stating: "It is always a pleasure to be able to write letters of appreciation for our crewmembers, and is particularly gratifying to see the same names complimented more than once. Your commitment and dedication are especially appreciated. Thank you for your service and continued efforts on behalf of Ryan International Airlines." (Complaint, Exhibit 04/37).

On March 25, 2003, Ms. Charpentier sent the plaintiff a letter stating: "I wanted to drop you a note to thanks [sic] you for a job well done. It's not often that people will take the time to thank or compliment, so when they do we know an outstanding impression was made, and for that, all of us at Ryan International Airlines, THANK YOU." (Complaint, Exhibit 06/39). She wrote the plaintiff again on April 9, 2003, complimenting him for helping another crew prep their aircraft and thanking him "for a job well done." (Complaint, Exhibit 08/41).

On April 8, 2003, Carrie Hoppe, Milwaukee station manager, wrote a letter to Ms. Charpentier, stating in part: "On the afternoon of Saturday, April 5, I witnessed sincere dedication and enthusiasm from the following flight attendants: Adam Pflueger, Don Callan, William Jackson, Stacy Westerhausen, Rosemary Jennaro, and Sue Evanson. . . . This display of teamwork should be recognized for we all can be enlightened by such a random act of kindness. (Complaint, Exhibit 07/40).

On March 20, 2003, the plaintiff and the rest of his crew were finished with all assigned flights and were in Chicago, Illinois. The crew was stranded in Chicago because of foul weather in Milwaukee. The plaintiff considered himself off duty. The plaintiff wanted to call

13

crew scheduling to obtain information about his options because he did not want to be stranded in Chicago. Mr. Pflueger, the lead flight attendant, told the plaintiff he was not to call the crew scheduling department because Mr. Pflueger had already called crew scheduling and was waiting to hear back. The plaintiff was angry. The plaintiff told Mr. Pflueger that his decision to not allow the plaintiff to call crew scheduling was "unacceptable." (Burkholder Affidavit, Exhibits A and B; Plaintiff's Deposition at 102 and Exhibit 5). The plaintiff disagreed with Mr. Pflueger, but complied and did not call the crew scheduling department.

Mr. Pflueger wrote up a Crew Report and gave the plaintiff a verbal warning on March 24, 2003. On March 29, 2003, the plaintiff wrote to the RIA Milwaukee station manager, Mr. Winter, requesting that the verbal warning be removed from his record. As station manager, Mr. Winter was involved with oversight of ground operations, not flight attendants. However, Mr. Winter indicated to the plaintiff that he would try to schedule a meeting with Ms. Bree, Mr. Pflueger and the plaintiff to discuss the matter. The meeting did not occur due to scheduling conflicts.

The plaintiff had assigned duty days on April 12 and April 15, 2003. On April 11, 2003, the plaintiff called in to the RIA crew scheduling department, stating that he was sick with a "lung infection." (Burkholder Affidavit, Exhibit B; Plaintiff's Deposition, Exhibit 18). On April 14, 2003, the plaintiff drove himself to the Veterans Administration (VA) hospital. The plaintiff did not call the crew scheduling department or his base coordinator at this time because he "felt like shit." (Burkholder Affidavit, Exhibit A; Plaintiff's Deposition at 131). While at the VA hospital in isolation, the plaintiff called the crew scheduling department, but he did not call his base coordinator.

Because Ms. Bree was traveling, it was not until a few days later that she found out that the plaintiff had missed two duty days and had twice called the crew scheduling

14

department to notify them of his absence, but had failed to contact her. These two failures to call his base coordinator mandated termination under IPP #7.

The plaintiff left the VA hospital on April 14, 2003. A Certification of Visit states: "Mr. William Jackson was seen in the VA - ER for an acute illness and may return to work 4/17 -." (Burkholder Affidavit, Exhibit B; Plaintiff's Deposition, Exhibit 19). The plaintiff fully recovered from the respiratory virus and had no work restrictions after his recovery. He returned to work for RIA after his recovery.

On April 15, 2003, the plaintiff e-mailed Mr. Winter, stating: "The VA has made an appointment for me on Monday 04-21-03 at 1530. Wish me luck." (Burkholder Affidavit, Exhibit B; Plaintiff's Deposition, Exhibit 21). On that same day, Mr. Winter wrote: "In your absence, did you notify Kerrie per memo dated 3/5? She doesn't seem to be aware that you were ill. Please notify her ASAP if you have not done so. She is in town. Thanks!" (Burkholder Affidavit, Exhibit B; Plaintiff's Deposition, Exhibit 21).

On April 15, 2003, the plaintiff e-mailed Ms. Bree, stating:

On my last flight toward the end of the workday I mentioned to crewmember Don that I was developing a bad sore throat. After we landed I went home (about 10 minutes away) and went to sleep. About 3 hours later I woke up with intense throat pain and started developing an aggressive lung and sinus congestion with coughing. As I attempted to get out of bead [sic] to get medicine when I stood up, I passed out scraping my left elbow. I was unconscious for a few days.

At some point in time, two days later, I remember waking up noticing I was on the floor. I was trying to orientate myself in the room as I could not pull myself onto my bed.

My home phone was next to me and only out of '**instinct**' did I call crew scheduling to cancel my next two duty days. Again, I passed out for several more hours and then started to come out of this stupor state. . ..

(Burkholder, Exhibit B, Plaintiff's Deposition, Exhibit 26; "Ammended [sic] Complaint", Exhibit 1a, Bates #1034). The plaintiff stated that he "had no humanly known means to contact

15

Kerrie under these medical conditions," and that by April 14, 2003, the plaintiff "had just enough energy to make [his] appointment with a doctor at the Milwaukee VA Hospital." Id**.**

Ms. Bree passed this information on to Ms. Rowl, the manager of inflight in Wichita, Kansas. Neither Ms. Bree nor Ms. Rowl believed that the plaintiff could have survived unconscious for a period of around six days, and Mr. Chiles was skeptical of it as well. Ms. Bree instructed the plaintiff to document his condition in writing and send it in.

The March 20, 2003, Crew Report authored by Mr. Pflueger was forwarded to Ms. Rowl for her review. Ms. Rowl reviewed the Crew Report, investigated the matter, and spoke with Ms. Bree. Ms. Bree believed that the plaintiff had called the crew scheduling department in violation of his lead flight attendant's order. In addition to reviewing the Crew Report, Ms. Rowl reviewed an email from Mr. Pflueger summarizing the incident. Based upon Mr. Pflueger's statements and her discussion with Ms. Bree, Ms. Rowl believed the plaintiff had called crew scheduling in violation of Mr. Pflueger's order. Therefore, on April 18, 2003, Ms. Rowl drafted a disciplinary notification for the plaintiff for insubordination.

Insubordination is grounds for termination under RIA's policies and Ms. Rowl has terminated both male and female employees for insubordination, as well as for other policy violations. However, Ms. Rowl decided to issue the plaintiff one warning to provide him with an opportunity to improve his behavior. Ms. Rowl was not aware until April 22, 2003, that the plaintiff had notified Mr. Winter on March 29, 2003, that he disputed his March 24, 2003 verbal warning.

Ms. Rowl directed Ms. Bree to provide the plaintiff with the notification. Since Ms. Bree was out of town, Ms. Bree asked Mr. Winter to give the notification to the plaintiff. On April 20, 2003, Mr. Winter provided the plaintiff with the notification. The notification stated that the plaintiff's conduct on March 20, 2003, was inappropriate and additional insubordinate

16

behavior would lead to termination. The plaintiff disagreed with the disciplinary notice and refused to sign it. The plaintiff wrote comments on the document indicating his objection to the claim because it stated that he had called crew scheduling against Mr. Pflueger's order.

Mr. Winter witnessed the plaintiff's refusal to sign the disciplinary notice on April 20, 2003, and noticed that the plaintiff was sweating at the time. He did not notice the plaintiff exhibiting any other unusual symptoms or behavior. Neither Mr. Winter, nor anyone on the plaintiff's flight that day, asked the plaintiff if he needed assistance or whether he was in need of a doctor. The plaintiff worked his complete shift on April 20, 2003, after receiving the disciplinary notice. The plaintiff had medication with him to control any medical problems he experienced.

Ms. Rowl was not present on April 20, 2003, when Mr. Winter provided the plaintiff with the disciplinary notice. She learned that the plaintiff disputed the discipline on April 22, 2003. Ms. Rowl did not initially investigate the plaintiff's dispute of the notification because she learned about it the same day the plaintiff was terminated.

On April 21, 2003, Ms. Rowl discovered that the plaintiff had two violations of RIA policy for failing to call his base coordinator when he was out sick on April 11 and 14, 2003. Consistent with RIA policy, Ms. Rowl instructed Ms. Bree to notify the plaintiff that he was terminated on April 22, 2003, for two violations of IPP #7.

The plaintiff notified Ms. Rowl via email on April 24, 2003, that he did not agree with the notification given to him on April 20, 2003, and wanted the insubordination removed from his record. Ms. Rowl responded to the plaintiff's email on the same day, explaining that the notification was based upon her investigation of the facts of the March 20, 2003, incident. She stated:

> I won't revise a Notification in response to a [flight attendant's] ultimatum. In response to your email, instead of giving me an ultimatum, an appropriate

> response would have been for you to let your base commander know that you disputed the Notification. I don't prepare or submit Notifications that inaccurately reflect the research, thus the reason I won't change Notifications simply because a FA insists the language of a Notification is incorrect.

(Plaintiff's Brief in Opposition, Bates #2836). Ms. Rowl continued, "[t]he matter of your insubordinate behavior is now moot, as you were not terminated for such behavior. Rather you were terminated for violating IPP#7." Id.

However, in response to the plaintiff's April 24, 2003, request, Ms. Rowl conducted an investigation and relayed the results to the plaintiff in a letter dated May 2, 2003. Based upon her investigation, Ms. Rowl could not determine whether or not the plaintiff actually had called the crew scheduling department against Mr. Pflueger's order. Therefore, she informed the plaintiff by letter on May 2, 2003, that the discipline for insubordination was retracted.

On April 24, 2003, the plaintiff e-mailed Ms. Charpentier and Mr. Chiles and requested that RIA reconsider his termination. On April 25, 2003, Mr. Chiles responded to the plaintiff via e-mail, informing him that Ms. Charpentier "has decided to uphold the termination" and that he should present any additional information that he wanted RIA to consider regarding his termination to Mr. Chiles. (Complaint, Exhibit 30). The plaintiff never provided any documentation to RIA regarding his illness, and did not provide any documentation to Mr. Chiles to justify why RIA should reconsider his termination.

On April 30, 2003, the plaintiff e-mailed Mr. Chiles, stating that RIA should reconsider his termination because he is an individual with a disability and protected by the Americans with Disabilities Act (ADA). This was the first time that the plaintiff informed Mr. Chiles that he had a claimed disability and needed an accommodation. Although the plaintiff was under the care of at least one doctor during his employment with RIA during the 2002-2003 season, no one at RIA was aware that the plaintiff was under a doctor's care.

18

In response to the plaintiff's e-mail, that same day, Mr. Chiles e-mailed the plaintiff and stated that he should provide RIA with any documentation indicating that he had a qualified disability or required accommodation. The plaintiff did not provide any medical or other documentation to Mr. Chiles or anyone at RIA to substantiate his claim that he had a disability.

The plaintiff never informed RIA that he had a disability; he did not inform anyone at RIA of his alleged condition when he began employment or at any point during his tenure at RIA. Ms. Bree, Ms. Rowl, Mr. Winter, and Mr. Chiles were not aware that the plaintiff claimed to have a disability or wanted an accommodation during his employment with RIA. The plaintiff did not believe it was necessary to inform RIA of his post traumatic stress disorder because he had it under control with medication. The plaintiff never requested an accommodation for his post traumatic stress disorder because it did not interfere with his work; he controlled his symptoms with medication.

Because April was the end of RIA's season and RIA's Milwaukee base had enough flight attendants, the plaintiff was not replaced with anyone after his termination. Instead, the flight attendants on reserve bid to fill in on the flights the plaintiff would have staffed.

The Charge of Discrimination the plaintiff filed with the EEOC on April 30, 2003, states that the cause of his discrimination was based upon a disability. In describing the disability, the plaintiff stated that he "was put into emergency room isolation on April 14 because the hospital thought [he] had Sudden Acute Respiratory Syndrome (SARS)." (Plaintiff's Complaint, Exhibit 31a). The plaintiff stated that he was terminated when he was unable to work due to this illness.

In his amended charge filed with the EEOC, the plaintiff stated that "[t]his life threatening disability/illness was a physiological disorder that adversely affected [his]

neurological, respiratory and cardiovascular body systems." (Burkholder Affidavit, Exhibit B, Plaintiff's Deposition, Exhibit 26, Bates #1014, ¶11). The plaintiff stated that he could not walk, speak, or care for himself and subsequently suffered an acute panic attack. The plaintiff claimed he was unjustly terminated due to this disability. He also asserted claims that the actions of Ms. Rowl subjected him to a hostile work environment and retaliatory discharge.

For the years 2001 through 2004, the flight attendant workforce at RIA was as follows:

2002:  201 females, 78 males;

2003:  195 females, 53 males; and

2004:  309 females, 74 males.

At the Milwaukee base, during the 2002-2003 season, there were 49 total flight attendants, 44 females and 5 males.

During the 2002-2003 season, three RIA flight attendants, including the plaintiff, were terminated for failure to call their base coordinator when absent or tardy. The plaintiff was the only male terminated for this reason. Six other employees were terminated for absenteeism, one male and five females. The Milwaukee base employed two male flight attendants at the time the plaintiff was employed with RIA: Adam Pflueger and Don Callan. Since that time, these two male flight attendants have continued to advance in the organization. Ms. Bree, who is still the Milwaukee based coordinator, promoted Mr. Pflueger to flight attendant instructor in January of 2004, and Mr. Callan was promoted to a lead flight attendant position in March of 2004.

## ANALYSIS

The plaintiff's amended complaint alleges discrimination and retaliation based on disability in violation of the ADA, and discrimination, a hostile work environment and retaliatory discharge based on gender in violation of Title VII. With respect to his ADA claim, the plaintiff

alleges that he provided the defendant with notice of a medical problem and requested accommodation for his disability, which triggered the mandatory interactive process under the ADA. The plaintiff states that he was discharged in retaliation. In support of his Title VII claim, the plaintiff contends that he is in a protected class as a male flight attendant working in a female dominated industry and that he was subjected to harassment, discrimination and retaliatory discharge on the basis of his sex.

At the outset, the defendant asserts that the plaintiff's Title VII claims of reverse gender discrimination and retaliation were not in his charge to the EEOC, were not acknowledged by the EEOC in its right to sue letter, and have no reasonable relationship to his claim of disability discrimination. Therefore, the defendant maintains that the Title VII claims must be dismissed. Although the defendant acknowledges that the plaintiff's amended charge filed with the EEOC does allege unlawful action by the defendant based on a hostile work environment and retaliation, the defendant maintains that there is no indication that these alleged unlawful actions were taken against the plaintiff because of his gender or any other protected classification under Title VII.

In response, the plaintiff states that his amended charge to the EEOC points to specific facts that are intertwined and support his claims of discrimination based on disability and his gender. The plaintiff asserts that the amended charge provided both the EEOC and the defendant with reasonable notice of the plaintiff's Title VII claims and, "if it were not for the Title VII violations the Title I violation would not have occurred." (Plaintiff's Brief in Opposition at 24).

Generally, a Title VII plaintiff may bring only those claims that were included in their EEOC charge, or claims that are reasonably related to the allegations of the charge and grow out of such allegations. McKenzie v. Illinois DOT, 92 F.3d 473, 481 (7th Cir. 1996) (citations

Case 2:03-cv-01395-PJG   Filed 09/16/05   Page 21 of 33   Document 112

omitted).  This standard is met if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge.  Cheek v. Western & Southern Life Ins. Co., 31 F.3d 497, 501 (7th Cir. 1994). "The claims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals." Id.

Here, the plaintiff's ADA and gender discrimination claims arise out of the totality of the events leading up to his termination. These events include: 1) the March 20, 2003 exchange between Adam Pflueger and the plaintiff which resulted in the issuance of a disciplinary notice; 2) the plaintiff's April 11-14, 2003, illness during which he failed to call his base coordinator, and 3) the resulting termination.

The claims in the plaintiff's amended EEOC charge and those in his complaint involve the same individuals, the same events and the same actions.  In addition to discrimination based on disability, the plaintiff's EEOC charge also states that he suffered harassment" and "retaliation" by female supervisors and a "hostile workplace environment."  The plaintiff did not specifically reference his sex or gender with respect to these claims.  However, courts have recognized that employees often file their EEOC charge without the assistance of a lawyer and should be afforded some leeway.  See e.g., Cheek, 31 F.3d at 500; Haugerud v. Amery Sch. Dist., 259 F.3d 678, 689 (7th Cir. 2001).

Construing the nature of the plaintiff's claims liberally, the court finds that there is a relationship between the allegations in the plaintiff's EEOC charge and the Title VII claims in his complaint.  Thus, the plaintiff's amended EEOC charge provides a basis for his claims

22

based on gender. Accordingly, the court will address both the plaintiff's ADA and Title VII claims.

**ADA Claims:**

It appears that the plaintiff bases his claims of disability on the following circumstances. First, he claims that on April 15, 2003, he invoked the ADA's protections by requesting an accommodation for his disability. Second, the plaintiff states that on April 20, 2003, he was served a disciplinary notice while he was in the performance of his crew-member duties and upon reading the notice, he had a sudden change in both mental and physical condition which triggered an acute medical problem that he refers to as a "traumatic stress reaction." (Amended Complaint, ¶ 28). He asserts that the resulting stress was so severe and intense that he required instant accommodation. The plaintiff alleges that the notice of a medical problem and need for accommodation were motivating factors in RIA's decision to terminate his employment.

Under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., an employer unlawfully discriminates against a "qualified individual with a disability" when it fails to make "reasonable accommodations to the known physical or mental limitations" of the disabled employee, unless to do so would impose an "undue hardship" on the employer. §§12112(a), (b)(5)(A). In order to make out a prima facie case of discrimination under the ADA a plaintiff must show: (1) that he suffers from a disability as defined in the statutes; (2) that he is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) that he has suffered an adverse employment action as a result of his disability. Jackson v. City of Chicago, 414 F.3d 806, 810 (7th Cir. 2005) (citing Silk v. City of Chicago, 194 F.3d 788, 798 [7th Cir. 1999]).

In addressing the first prong of prima facie case, the court must determine whether the plaintiff suffered from a disability as defined in the statute. Not all plaintiffs with health conditions have a disability within the meaning of the ADA. Nawrot v. CPC Int'l, 277 F.3d 896, 903 (7th Cir. 2002) (citing Christian v. St. Anthony Med. Ctr., Inc., 117 F.3d 1051, 1053 [7th Cir. 1997] ["The Act is not a general protection of medically afflicted persons."]). To claim the protection of the ADA, plaintiffs must come within the coverage of the statutory definition of disability. Nawrot, 277 F.3d at 903, (citing Moore v. J.B. Hunt Transport, Inc., 221 F.3d 944, 950 [7th Cir. 2000]).

The ADA defines "disability" as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2). The claims asserted by the plaintiff do not implicate the definitions set forth in subsections B and C. Thus, the court will determine whether the plaintiff suffered from a physical or mental impairment that substantially limits one or more of his major life activities.

In analyzing whether the plaintiff meets this definition, the court must "conduct a three-step inquiry. The court must determine whether the plaintiff's condition constitutes an impairment under the ADA, whether the activity upon which the plaintiff relies constitutes a major life activity, and whether the impairment substantially limited the performance of the major life activity." EEOC v. Sears, 417 F.3d 789, 797 (7th Cir. 2005), (citing Bragdon v. Abbott, 524 U.S. 624, 631[1998]).

According to the plaintiff, on April 11, 2003, he made RIA aware the he was ill when he called the crew scheduling department to inform it that he had a lung infection. He did not work on his scheduled duty days of April 12 and April 15, 2003. However, the plaintiff's affliction lasted only a few days. The undisputed facts demonstrate that the plaintiff fully

24

recovered from this illness and returned to work. There is no evidence to demonstrate that the plaintiff suffered from an impairment that substantially limited the performance of a major life activity. Thus, the court finds that this short-lived illness does not meet the criteria of a "disability" within the meaning of the ADA. See e.g., Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 381 (3d. Cir. 2002) (pneumonia is a temporary condition and is not protected by the ADA); Procopio v. Castrol Indus. N. Am., 132 Lab. Cas. (CCH) P33,473 (E.D. Pa. 1996) (Brief episode of flu-like symptoms is not disability within meaning of ADA).

The plaintiff also refers to the day he was provided with the disciplinary notice. According to the plaintiff, he had a sudden change in both mental and physical condition and this condition required instant accommodation. The plaintiff provides no indication of the nature of his claimed disability, although he refers to this sudden illness as "spiking acute stress," requiring "accommodation for the possibility of work place trauma induced heart attack, panic attack, etc." (Amended Complaint ¶10). The facts before the court show that this problem was temporary. The plaintiff was able to work and manage the problem with medication. Thus, the evidence fails to support a claim that the plaintiff suffered a substantial impairment of a major life activity.

Moreover, the defendant had no knowledge of the plaintiff's discomfort. Mr. Winter, the individual who served the disciplinary notice, merely noticed that the plaintiff was sweating at the time. He did not notice the plaintiff exhibiting any other unusual symptoms or behavior, and the plaintiff worked his shift that day without incident.

The court finds that the plaintiff has not established that these stressful circumstances constituted a physical or mental impairment that substantially limited one or more of his major life activities. 42 U.S.C. § 12102(2)(A); see e.g., Hamilton v. Southwestern Bell Tel. Co., 136 F.3d 1047 (5th Cir. 1998) (Individual's post traumatic stress disorder was not a disability within

the meaning of the ADA where it had no long term impact on his ability to care for himself or on his ability to work). Accordingly, the plaintiff has failed to meet the first requirement of establishing a prima facie case. See Jackson, 414 F.3d at 810. Since the undisputed facts fail to demonstrate that the plaintiff suffered from a physical or mental impairment that substantially limited one of more of his major life activities, he has not established that he has a disability within the meaning of the ADA.

The court also notes that the plaintiff contends that RIA failed to engage in the required interactive process with him in order to develop an accommodation. However, the undisputed facts establish that the plaintiff did not notify his employer of his disability while employed at RIA. It was not until April 30, 2003, after his termination, that the plaintiff e-mailed Mr. Chiles and advised him that he had a disability and was in need of accommodation. An "employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations." Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130, 1134 (7th Cir. 1996). See also, Sears, 417 F.3d 803. The employer's knowledge of the disability is a prerequisite to finding liability. Id. The undisputed facts also show that even though Mr. Chiles asked the plaintiff to provide documentation supporting his claimed disability, the plaintiff never provided this information to RIA.

In sum, the plaintiff has not established a prima facie case of discrimination based on "disability" as defined in the statute when he was employed at RIA. Therefore, the defendant's motion for summary judgment on the plaintiff's claim of discrimination under the ADA will be granted.

**Retaliation - ADA**

The plaintiff also claims that he requested accommodation for his disability which resulted in his retaliatory discharge. Section 12203 of the ADA prohibits acts of retaliation against employees who oppose the discriminatory practices of employers:

> **Retaliation**. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act.

42 U.S.C. § 12203(a).

In contrast to an ADA discrimination case, the plaintiff in an ADA retaliation case need not establish that he is a qualified individual with a disability. Krouse v. American Sterilizer Co., 126 F.3d 494, 502 (3d Cir. 1997). The ADA retaliation provision protects any individual who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA. 42 U.S.C. § 12203(a).

An employee demonstrating a prima facie case of retaliation under the ADA must prove (1) that he engaged in statutorily protected activity, (2) that he suffered an adverse employment action, and (3) that there is a causal connection between the two events. Pugh v. City of Attica, 259 F.3d 619, 630 (7th Cir. 2001), (citing Contreras v. Suncast Corp., 237 F.3d 756, 765 [7th Cir. 2001]). To prevail, the plaintiff must also rebut the defendant's nondiscriminatory reasons for the adverse action and establish that a discriminatory motive was the determining factor behind the employer's action. Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1096 (7th Cir. 1998).

The plaintiff states that he engaged in a protected activity, namely, that he requested an accommodation based upon disability. The defendant's decision to terminate the plaintiff, rather than reconsider that determination, appears to be the basis of the plaintiff's contention

that the defendant failed to accommodate him. An accommodation means that the "employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." Siefken v. Village of Arlington Heights, 65 F.3d 664, 666 (7th Cir. 1995) (quoting Vande Zande v. Wisconsin Dep't of Admin., 44 F.3d 538, 543 (7th Cir. 1995).

The accommodation the plaintiff apparently wanted was to be reinstated to his position. Even assuming that this accommodation constitutes a statutorily protected activity, a "second chance" is not an accommodation envisioned by the ADA. Id. Moreover, there is another problem with the plaintiff's retaliation claim. According to the undisputed facts, the plaintiff did not request any accommodation until after his termination. Therefore, although the plaintiff suffered an adverse employment action, the undisputed facts do not show a causal connection between his termination and his request for an accommodation based on a disability.

Furthermore, the plaintiff cannot rebut the defendant's nondiscriminatory reason for the adverse action. The plaintiff was terminated because he twice failed to comply with the company policy which required him to call both the crew scheduling department and his base coordinator if he was going to be absent or tardy. The plaintiff has not shown that this reason for his termination was pretextual. Therefore, the plaintiff has failed to establish a prima facie case of retaliation under the ADA.

In light of the foregoing, the court concludes that the plaintiff has note established a violation of the ADA. The defendant's motion for summary judgment on the ADA claim will be granted.

**Reverse Gender Discrimination - Title VII**

The plaintiff claims that he was discriminated against because of his sex. He alleges that he is a male minority flight attendant in a substantially female dominated industry and that he was discriminated against for opposing an action that he perceived as an unlawful employment practice. The plaintiff asserts that he was discriminated against when he was terminated after he invoked federal protections, opposed, wrote on and refused to sign the disciplinary notice that he was served with on April 20, 2003. (Amended Complaint ¶¶58, 59, 62). The plaintiff further contends that his termination was a retaliatory discharge.

Title VII prohibits employers from discriminating against employees on the basis of sex or gender. 42 U.S.C. § 2000e-2(a)(1). Claims of discrimination under Title VII can be proven either through direct or indirect evidence. O'Regan v. Arbitration Forums, Inc., 246 F.3d 975, 983 (7th Cir. 2001). "Evidence which in and of itself suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination." Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997). A proffer of direct evidence must relate to the specific employment decision in question. Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7th Cir. 1997).

Here, the plaintiff has presented no direct evidence of discrimination and, thus, his claim proceeds under the indirect method. The indirect method requires that the plaintiff apply the burden-shifting method outlined by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981); see also, Kirk v. Federal Property Management Corp., 22 F.3d 135, 138 (7th Cir. 1994).

Initially, the burden is on the plaintiff to establish a prima facie case of discrimination. To establish a prima facie case of reverse gender discrimination, the plaintiff must show: 1) that a particular employer has reason or inclination to discriminate invidiously against whites [or men] or evidence that there is something 'fishy' about the facts at hand; 2) that the plaintiff performed the job satisfactorily; 3) that he suffered an adverse employment action; and 4) that his employer treated similarly situated employees outside the protected class more favorably. Gore v. Indiana University, 416 F.3d 590, 592 (7th Cir. 2005); Maarouf v. Walker Mfg. Co., Div. of Tenneco Automotive, Inc., 210 F.3d 750, 752 (7th Cir. 2000) (citing Stalter v. Wal-Mart Stores, Inc., 195 F.3d 285, 289 [7th Cir. 1999]).

As the court explained in Gore:

> . . . the conventional McDonnell Douglas framework is not very helpful for so-called reverse-discrimination cases. Because it "is the unusual employer who discriminates against majority employees," Mills v. Health Care Serv. Corp., 171 F.3d 450, 456-57 (7th Cir. 1999), a male plaintiff alleging gender discrimination must show something more than the fact that he is gendered. See, e.g., Katerinos v. U.S. Dep't of Treasury, 368 F.3d 733, 736 (7th Cir. 2004). This was what we meant in Phelan v. City of Chicago, 347 F.3d 679, 684 (7th Cir. 2003), when we said that in cases of reverse discrimination, "the first prong of the McDonnell test cannot be used." Rather, the plaintiff in such cases "must show background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites [or men] or evidence that there is something 'fishy' about the facts at hand." Id.

416 F.3d at 592.

If the plaintiff establishes all the elements of a prima facie case, the plaintiff raises an inference of discrimination. See Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1132 (7th Cir. 1994). Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment decision. Kirk, 22 F.3d 138. Finally, if the defendant produces a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason was pretextual. Id. The plaintiff may prove pretext directly by

showing that "a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason [for the adverse employment action] is unworthy of credence." Billups v. Methodist Hosp. of Chicago, 922 F.2d 1300, 1303 (7th Cir. 1991) citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 256[1981]).

In this case, although the plaintiff asserts that he is a male flight attendant in a predominantly female dominated industry, he has not demonstrated that RIA had reason to discriminate against men. Rather, the facts establish the both men and women were terminated for failure to comply with the company policy requiring notification of the base commander for any absence. Three RIA flight attendants were terminated during the 2002-2003 season for failure to call their base coordinator when absent or tardy. The plaintiff was one of those individuals. The other two were female. Six other employees were terminated for absenteeism. One was male and five were female. Furthermore, contrary to the plaintiff's assertion that he was replaced by a female, no one was hired to replace him. Instead, flight attendants on reserve bid to fill in on the flights the plaintiff would have staffed.

The plaintiff has presented no evidence to establish that RIA had a reason to discriminate invidiously against men or that there is something "fishy" about the facts in this action. See Gore, 416 F.3d at 592. He has not established that RIA's decisions regarding him had anything to do with his gender. The plaintiff must provide more than unsupported argument and submission of the fact that he is a male to establish that he was subjected to reverse discrimination. Based on the facts before the court, the plaintiff has failed to establish the first prong of a prima facie case of reverse discrimination. See Gore, 416 F.3d at 592. A plaintiff must establish all of the elements of a prima facie case to raise an inference of discrimination. See Lenoir, 13 F.3d at 1132.

The plaintiff also has not shown that similarly situated female employees were treated more favorably. He has not presented evidence indicating which females he contends were similarly situated to him. Based upon the undisputed facts, the court concludes that the plaintiff has not established a prima facie case of reverse discrimination.

The plaintiff also asserts a hostile work environment claim. "A hostile environment claim falls under the general rubric of harassment at the workplace, which can amount to prohibited discrimination in terms and conditions of employment." Cerros v. Steel Technologies, Inc., 288 F.3d 1040, 1045 (7th Cir. 2002). A "hostile work environment is created by conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." Cooke v. Stefani Management Services, Inc., 250 F.3d 564, 560 (7th Cir. 2001). To demonstrate harassment that rises to the level of a statutory violation, the plaintiff must establish that "his or her work environment was both subjectively and objectively offensive; 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" Gentry v. Export Packaging Co., 238 F.3d 842, 850 (7th Cir. 2001) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787 [1998]).

The record is devoid of facts which could support a hostile work environment claim. The plaintiff received a disciplinary notice which was subsequently withdrawn when it was found to be based on erroneous information and he was terminated for violating company policy. The facts before the court show that a reasonable person would not find the plaintiff's work environment objectively hostile or abusive. Accordingly, the court concludes that the defendant is entitled to summary judgment on the plaintiff's hostile work environment claim.

With respect to any Title VII retaliation claim, the elements of a retaliation claim are the same under Title VII and the ADA. United States v. Talanda, 140 F.3d 1090, 1095 (7th Cir.

1998). The plaintiff does not clearly articulate the nature of his statutorily protected expression or action which is a necessary to establish a claim of retaliation. Regardless, as with his ADA claim, the plaintiff has presented no facts to establish that there is a causal link between any protected expression or action and his termination. Thus, the defendant's motion for summary judgment on the plaintiff's Title VII claim will be granted.

In sum, for the reasons stated herein, the plaintiff has not established a prima facie case of a violation of either the ADA or Title VII. Accordingly, the defendant's motion for summary judgment on these claims will be granted. The plaintiff's motion for an order denying the defendant's motion for summary judgment will be denied.

## CONCLUSION

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion to strike (Docket #107) be and hereby is **granted in part and denied in part.** The defendant's motion to strike the plaintiff's request for judicial notice will be **granted.** The defendant's motion to strike will be **denied** in all other respects.

**IT IS FURTHER ORDERED**, that the defendant's motion for summary judgment (Docket # 82) be and hereby is **granted**.

**IT IS ALSO** that the plaintiff's motion for order to deny the defendant's motion for summary judgment (Docket #93) be and hereby is **denied.**

**IT IS FURTHER ORDERED,** that the clerk of court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 16th day of September, 2005.

BY THE COURT:

　s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge

33